


AO 91 (Rev. 11/11) Criminal Complaint             AUSA Anne Yonover (312) 886-2038

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN MCMULLEN, also known as "Kevo", | CASE NUMBER: 1:26-cr-00099 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about August 28, 2025, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | The defendant did knowingly and intentionally distribute a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

*Lauren Stalcup*

Lauren Stalcup
Special Agent, Federal Bureau of Investigation

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: 3/10/26

*Judge's signature*

City and state: Chicago, Illinois        JEFFREY T. GILBERT, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Lauren Stalcup, being duly sworn, state as follows:

### I. INTRODUCTION AND AFFIANT BACKGROUND

1. I am a sworn federal law enforcement officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses pursuant to Titles 18, and 21 of the United States Code. I have been employed as a Special Agent with the FBI since June 2023. Prior to working for the FBI, I graduated with a Master of Accounting degree and obtained a Certified Public Accountant (CPA) license. I then worked for a public accounting firm and audited third party financial statements for approximately three years. As part of my duties as an FBI Special Agent, I have been involved in the enforcement and investigation of numerous violations of federal law to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, witnesses, and others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. I have participated in numerous investigations involving violations of narcotics and firearms laws. I have received training concerning criminal enterprises, narcotics, and firearm investigations. I have also been trained in the areas of physical surveillance and controlled purchases of narcotics.

2. The statements contained in this Affidavit are based on information

derived from my personal knowledge, training and experience; information obtained from and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; analysis of public records; my review of audio and video recordings; and seizure of physical evidence.

3. I have relied on informants and undercover law enforcement officers to investigate narcotics trafficking. Through interviews and debriefings of individuals involved in those offenses, I have learned about the manner in which individuals and organizations finance, purchase, transport, and distribute narcotics both within and outside of Illinois. I have used informants and undercover law enforcement officers to conduct "controlled purchases" of controlled substances from individuals. I have also conducted surveillance of individuals engaged in drug trafficking and participated in the execution of numerous search warrants resulting in the seizure of drugs.

4. Based on my training and experience, I have become familiar with the language used over the telephone to discuss firearms and drug trafficking and know that the language is often limited, guarded, and coded. I also know that drug traffickers often use electronic devices (such as computers and cellular phones) and social media to facilitate these crimes. Based on my experience, I know that drug traffickers may keep photographs of these items on electronic devices.

5. I also know that drug traffickers commonly possess—on their person, at their residences, at their places of business, in their vehicles, and other locations where they exercise dominion and control—narcotics, and records or receipts pertaining to such.

6. The facts in this affidavit come from my personal observations, my training and experience, my review of audio and video recordings, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all my knowledge about this matter.

7. I am submitting this affidavit in support of a Federal Criminal Complaint alleging that KEVIN MCMULLEN, also known as "Kevo," knowingly and intentionally distributed a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide) in violation of Title 21, United States Code, Section 841(a)(1) (the "**Subject Offense**"). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MCMULLEN with the **Subject Offense**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the **Subject Offense** alleged in the complaint.

II. **SUMMARY OF PROBABLE CAUSE**

8. The FBI is conducting a criminal investigation of MCMULLEN and others known and unknown regarding the **Subject Offense**. Between August 2025 and January 2026, an undercover law enforcement officer ("UCE-1") conducted four controlled drug purchases from MCMULLEN. On August 28, 2025, UCE-1 purchased 49.9 grams of fentanyl from MCMULLEN. On September 17, 2025, UCE-1 purchased

3

68.4 grams of fentanyl and heroin from MCMULLEN. On November 19, 2025, UCE-1 purchased 99.3 grams of fentanyl and heroin from MCMULLEN. On January 13, 2026, UCE-1 purchased 145.4 grams of fentanyl from MCMULLEN.

### III. STATEMENT OF PROBABLE CAUSE

#### a. Communications between UCE-1 and MCMULLEN leading to August 28, 2025 fentanyl transaction

9. On or about July 28, 2025, a confidential informant ("CI-1")[1] advised law enforcement that MCMULLEN, who resides in Chicago, Illinois, was contacting individuals in north central Wisconsin, including CI-1, via Facebook to sell fentanyl/heroin.

10. At the direction of law enforcement, on or about July 29, 2025, at approximately 1:50 p.m., CI-1 sent an outgoing Facebook message to MCMULLEN providing a phone number that belonged to UCE-1.

11. On or about July 31, 2025, at approximately 2:51 p.m., UCE-1 received an incoming phone call from telephone number 708-XXX-5121 ("McMullen's Phone").[2] UCE-1 did not answer the phone call from McMullen's Phone, but UCE-1

---

[1] CI-1 began providing information to law enforcement in approximately March 2023. CI-1 has a criminal history that includes convictions for resisting law enforcement, theft, firearms offenses, and narcotics offenses. CI-1 is working for monetary compensation in exchange for their cooperation and assistance in investigations. To date, CI-1 has been paid $340 for their cooperation and assistance in law enforcement investigations, and specifically, $150 for the instant investigation. In addition to the instant investigation, CI-1 has provided information to law enforcement in other investigations. Law enforcement believes the information provided by CI-1 is credible as it has been corroborated in significant respects by independent evidence, including surveillance, narcotics seizures, phone records, consensually recorded conversations, and in-person meetings, among other ways.

[2] According to subscriber information obtained from T-Mobile for telephone number 708-XXX-5121, the number is subscribed to Kevin McMullen at an address located on the 1900 block of N Drake Ave., in Chicago, Illinois.

4

recognized the telephone number ending in -5121 as McMullen's Phone based on conversations with CI-1 prior to receiving the incoming phone call.

12. On or about July 31, 2025, between approximately 2:52 p.m., and 2:56 p.m., UCE-1 and McMullen's Phone exchanged the following text messages:

> MCMULLEN: *Tj what's up man I hope all is well your guy told me to give I a call what time is good for u I get off in like 10 minutes?*
>
> MCMULLEN: *My name Kevo*
>
> UCE-1: *Yo sorry I missed ya call. I'll hit ya back in 10 if that good*
>
> MCMULLEN: *Ok bet*

13. On or about July 31, 2025, at approximately 3:16 p.m., UCE-1 conducted an outgoing phone call to McMullen's Phone.[3] MCMULLEN disclosed to UCE-1 that MCMULLEN was unable to travel to Wisconsin because MCMULLEN was "on papers." Based on my training and experience, "on papers" is a commonly used slang term which refers to an individual being on probation or parole. Based on my knowledge of this investigation, as well as my review of various text messages between UCE-1 and McMullen's Phone, MCMULLEN believes UCE-1 resides in north central Wisconsin and MCMULLEN is resistant to travel to Wisconsin with narcotics due to a prior conviction MCMULLEN has from Wisconsin.

14. During the telephone call that occurred at approximately 3:16 p.m., MCMULLEN stated, "So, I'mma try see if I can get maybe 60 65 I'm thinkin but if I can do but if I can get to like the 55 I'm a try that." Based on my training and experience and my knowledge of the investigation, as well as my conversations with

---

[3] All of the phone calls discussed in this affidavit between UCE-1 and MCMULLEN at the McMullen Phone were recorded using a recording device.

5

UCE-1, I understood this to mean MCMULLEN was trying to sell a gram of fentanyl/heroin for $55 to $65. In response, UCE-1 stated, "I mean, I mean, like, like, like, like 50 grams bro. Like 50 g's, so." Based on my conversations with UCE-1, UCE-1 was arranging to purchase approximately 50 grams of fentanyl/heroin from MCMULLEN.

15. On or about July 31, 2025, between approximately 6:48 p.m., and 6:58 p.m., UCE-1 and McMullen's Phone exchanged the following text messages:

> MCMULLEN: *$65 cool? If u get 50 or better*
>
> UCE-1: *I can fuck with that . . . anyway chance of a brake if I do better?*
>
> MCMULLEN: *Yea I got u*

16. Based on my knowledge of this investigation and conversations with UCE-1, MCMULLEN offered to sell UCE-1 50 grams of fentanyl/heroin for $65 a gram. UCE-1 agreed to the price of $65 a gram. Based on my training and experience, when UCE-1 stated *"a break if I do better"* UCE-1 was requesting a price break. Based on my training and experience, it is common for narcotics suppliers to provide a discounted price if a customer purchases larger quantities of narcotics. Based on the text message exchange between UCE-1 and MCMULLEN, MCMULLEN confirmed that he would provide a price break when he stated, *"Yeah I got u"*.

17. On or about August 25, 2025, between approximately 3:54 p.m., and 4:09 p.m., UCE-1 and McMullen's Phone exchanged the following text messages:

> UCE-1: *What good wit u.. thursday good for u?*
>
> MCMULLEN: *What up*
>
> MCMULLEN: *Yea Thursday good for me*

> MCMULLEN: *What u getting so I can get it ready for u?*
>
> UCE-1: *Call u?*
>
> MCMULLEN: *Yep*

18. On or about August 25, 2025, at approximately 4:13 p.m., UCE-1 conducted an outgoing phone call to McMullen's phone. The following pertinent conversation occurred:

> UCE-1: *Oh shit, yeah dog, yeah I'm only going to do the fifty this time around just cuz I gotta buy a new fuckin ride.*
>
> MCMULLEN: *Okay.*
>
> UCE-1: *So I don't want to spread myself too thin. But if you're good on that fifty, I'll do that.*
>
> MCMULLEN: *Yeah, fo'sho, I got you, [UI] ain't trip.*
>
> UCE-1: *Alright, right.*
>
> MCMULLEN: *All good, I'll be ready for you.*
>
> UCE-1: *Hey, what time, what time you work 'til then on Thursday?*
>
> MCMULLEN: *What?*
>
> UCE-1: *Like, what time, what time you thinkin?*
>
> MCMULLEN: *I'm off at three.*

19. Based on my knowledge of the investigation and conversations with UCE-1, UCE-1 was arranging for a controlled narcotics purchase with MCMULLEN to occur on Thursday, August 28, 2025. MCMULLEN stated the purchase could occur after 3:00 p.m., when he got off work. UCE-1 told MCMULLEN that UCE-1 wanted to purchase approximately 50 grams of fentanyl/heroin. MCMULLEN confirmed that MCMULLEN would have the requested quantity ready when UCE-1 arrived.

### b. August 28, 2025 Fentanyl Transaction

20. On or about August 28, 2025, at approximately 3:00 p.m., UCE-1 met with law enforcement at a pre-determined location. UCE-1 received $3,000 for the intended purchase of 50 grams of fentanyl/heroin.

21. On or about August 28, 2025, at approximately 3:51 p.m., UCE-1 was equipped with covert audio and video recording equipment. UCE-1 then traveled to a gas station located on the 1700 block of Armitage Avenue in Chicago, Illinois where UCE-1 and MCMULLEN had agreed to meet.

22. Based on law enforcement surveillance, at approximately 4:06 p.m., UCE-1 arrived at the gas station where MCMULLEN and UCE-1 agreed to meet. At approximately 4:10 p.m., UCE-1 received an incoming phone call from McMullen's Phone. The following conversation occurred:

> UCE-1: *Hey, what up man? Yeah, hey, I'm just pullin in right now.*
>
> MCMULLEN: *Okay, um, yeah pullin up in let's say 10 minutes*
>
> UCE-1: *Alright, bet bro. What are you in?*
>
> McMullen: *I'm in a white Impala.*

23. According to law enforcement surveillance, at approximately 4:50 p.m., a white Chevrolet Impala bearing Illinois license plate DP23772 ("McMullen's Impala") arrived at the gas station. According to law enforcement databases, Kevin MCMULLEN is the registered owner of a 2017 white Chevrolet Impala bearing Illinois license plate DP23772. At approximately 4:50 p.m., UCE-1 received an incoming text message from McMullen's Phone which stated, "Come on" once McMullen's Impala parked at a gas pump. UCE-1 exited UCE-1's vehicle and entered

the passenger seat of McMullen's Impala. Based on law enforcement surveillance, McMullen's Impala then pulled out of the gas station parking lot and parked on a side street near the gas station.

24. According to UCE-1, once UCE-1 was inside McMullen's Impala, UCE-1 observed MCMULLEN push a button on the dashboard. The navigation screen then opened, and MCULLEN pulled a clear plastic baggie out of the compartment behind the navigation screen. According to UCE-1, MCMULLEN handed the clear plastic bag, which was knotted at the top, to UCE-1. UCE-1 handed MCMULLEN $3,000, which MCMULLEN counted.

25. While UCE-1 was in the passenger seat of MCMULLEN's Impala, the following recorded conversation occurred between MCMULLEN and UCE-1:

> MCMULLEN: *So how you want to do this? You want to try that shit? Or you want me to try it?*
>
> UCE-1: *I don't need to try it. I don't use, I just flip it so*
>
> MCMULLEN: *Okay well cool.*
>
> UCE-1: *So as long, as long it weighs out, I'm good man.*
>
> MCMULLEN: *It do.*

26. Based on my knowledge of this investigation and conversations with UCE-1, MCMULLEN asked UCE-1 if UCE-1 would like to test the white substance inside the clear baggie or if UCE-1 would prefer MCMULLEN to try it. UCE-1 declined the offer and explained that UCE-1 sold the narcotics and does not use them. UCE-1 stated if the package weighed the requested amount (50 grams), then UCE-1 was satisfied with the transaction. MCMULLEN ensured UCE-1 that the package weighed 50 grams.

27. At approximately 4:55 p.m., law enforcement surveillance observed UCE-1 exit the passenger seat of McMullen's Impala and enter UCE-1's vehicle. Based on law enforcement surveillance, McMullen's Impala and UCE-1 departed the area at approximately 4:55 p.m.

28. UCE-1 traveled to a predetermined meeting location following the transaction and provided law enforcement agents with the clear plastic bag which was knotted at the top and contained a white substance. Based on lab results from the Drug Enforcement Administration's laboratory, the substance weighed approximately 49.9 grams and tested positive for fentanyl.

29. Based on my review of MCMULLEN's Illinois driver's license photo and the images captured on UCE-1's covert recording device, the person who conducted the controlled narcotics transaction with UCE-1 on August 28, 2025, matches the appearance of the person depicted in MCMULLEN'S Illinois' driver's license photo. Additionally, prior to the controlled transaction on August 28, 2025, UCE-1 had observed MCMULLEN'S Illinois' driver's license photo and following the transaction on August 28, 2025, UCE-1 confirmed that the person UCE-1 purchased the narcotics from in McMullen's Impala matched the appearance of the person depicted in MCMULLEN'S Illinois' driver's license.

### c. Subsequent Narcotics Transactions Between UCE-1 and MCMULLEN

30. Following the August 28, 2025, transaction, UCE-1 coordinate another transaction to purchase fentanyl/heroin from MCMULLEN on September 17, 2025. Prior to the transaction, UCE-1 met with law enforcement officers and received an audio and video recording device along with $6,000 for the intended purchase of

10

approximately 100 grams of fentanyl/heroin from MCMULLEN. During the September 17, 2025 purchase, UCE-1 met with MCMULLEN in a grocery store parking lot located on the 1300 block of Canal Street in Chicago, Illinois.

31. According to law enforcement surveillance, on or about September 17, 2025, at approximately 6:26 p.m., McMullen's Impala parked in the grocery store parking lot. Shortly thereafter, UCE-1 parked next to McMullen's Impala. According to UCE-1 and the recording device, UCE-1 entered the passenger seat of McMullen's Impala. Shortly thereafter, according to UCE-1 and the recording device, an unknown male entered the back seat of McMullen's Impala and handed MCMULLEN a clear plastic bag that was knotted at the top and contained a brown substance. According to UCE-1, MCMULLEN then handed that bag to UCE-1 and UCE-1 provided MCMULLEN with $6,000. According to UCE-1 and the recording device, UCE-1 then exited the passenger seat of McMullen's Impala and entered UCE-1's vehicle. While sitting in UCE-1's vehicle, UCE-1 observed MCMULLEN count the cash and hand a portion of the cash to the unknown male in the back seat of McMullen's Impala. UCE-1 then traveled to a predetermined location and provided law enforcement officers with the clear plastic bag with the brown substance that UCE-1 had purchased from MCMULLEN.

32. Based on lab results from the Drug Enforcement Administration's laboratory, the substance weighed approximately 68.4 grams and tested positive for fentanyl and heroin.

33. Following the September 17, 2025, transaction, UCE-1 coordinate another transaction to purchase fentanyl/heroin from MCMULLEN on November 19,

2025. Similar to the August 28, 2025 transaction, UCE-1 met with MCMULLEN at the same gas station located on the 1700 block of Armitage Avenue in Chicago, Illinois. UCE-1 had an audio and video recording device that captured this transaction.

34. According to law enforcement surveillance, on or about November 19, 2025, at approximately 2:12 p.m., UCE-1 arrived at the gas station. UCE-1 arrived before MCMULLEN. McMullen's Impala arrived at the gas station approximately two minutes later. According to law enforcement surveillance, at approximately 2:16 p.m., UCE-1 entered the passenger seat of McMullen's Impala. According to UCE-1, MCMULLEN obtained a blue rubber glove from a compartment located behind the navigation screen in McMullen's Impala. According to UCE-1 and the recording device, MCMULLEN provided UCE-1 with the blue rubber glove, which law enforcement later determined contained two individually packaged baggies – one clear plastic bag that was knotted at the top containing a brown substance and one clear plastic bag that was knotted at the top containing a white substance. While in McMullen's Impala, according to UCE-1 and the recording, UCE-1 weighed the blue plastic glove and confirmed the amount purchased was the amount provided. According to UCE-1 and the recording, UCE-1 provided MCMULLEN $10,000. According to law enforcement surveillance, UCE-1 then exited the passenger seat of McMullen's Impala, entered UCE-1's vehicle, and departed the area. UCE-1 traveled to a predetermined location and provided law enforcement officers with the blue rubber glove, which contained the two individually packaged baggies.

35. Based on lab results from the Drug Enforcement Administration's laboratory, the brown substance weighed approximately 99.3 grams and tested positive for fentanyl and heroin, and the white substance weighed approximately 86.9 grams and did not test positive for narcotics.

36. Following the November 19, 2025, transaction, UCE-1 coordinated another transaction to purchase fentanyl/heroin from MCMULLEN on January 13, 2026. For purposes of this transaction, they agreed to meet on the 3900 block of W. Jackson Blvd in Chicago, Illinois. UCE-1 was equipped with covert audio and video recording equipment and provided $10,000 to purchase approximately 200 grams of fentanyl/heroin which UCE-1 ordered from MCMULLEN.

37. On or about January 13, 2026, at approximately 1:40 p.m., UCE-1 met MCMULLEN on the 3900 block of W. Jackson Blvd. According to law enforcement surveillance, the recording device, and UCE-1, MCMULLEN approached the passenger side of UCE-1's vehicle. According to the recording, UCE-1 opened the front passenger side of the window and MCMULLEN handed UCE-1 a clear plastic bag that was knotted at the top containing a white powder like substance. According to the recording and UCE-1, UCE-1 weighed the clear plastic bag that was knotted at the top containing a white substance on a portable scale, which UCE-1 brought to the transaction. According to the recording, UCE-1 then provided MCMULLEN with $8,800, which was less than the agreed upon price because the drugs did not match the weight that UCE-1 had ordered. Following this exchange, UCE-1 traveled to a predetermined location and provided law enforcement officers with the clear plastic bag that was knotted at the top containing a white powder like substance.

38. Based on lab results from the Drug Enforcement Administration's laboratory, the white powder like substance weighed approximately 145.4 grams and tested positive for fentanyl.

### IV. CONCLUSION

39. For all the reasons described above, I respectfully submit that there is probable cause to believe that on or about August 28, 2025, KEVIN MCMULLEN, also known as "Kevo," knowingly and intentionally distributed a controlled substance, namely 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide) in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

*Lauren Stalcup*

LAUREN ELSIE STALCUP
Special Agent,
Federal Bureau of Investigation

SWORN TO AND AFFIRMED
by telephone March 10, 2026

Honorable Jeffrey T. Gilbert
United States Magistrate Judge

14